FILED

OCT 14 2025

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

1  UNITED STATES DISTRICT COURT FOR THE
2  EASTERN DISTRICT OF CALIFORNIA

3  Jamie Osuna, CDCR#BD0868

Docket No.: 1:25-mc-00086-SAB

4  CSP/CORCORAN

5  P.O.BOX:3476

REQUEST/NOTICE: TO CLERK AND COURT
6  CORCORAN, CA 93212

TO GRANT REQUEST TO BE EXEMPT/RELIEVED
FROM THE E-FILING OF ENCLOSED COMPLINT
DUE TO; E-FILING IS NOT AVAILABLE TO
7  Plaintiff.,

PLAINTIFF AND PRISON REFUSING TO
v.

E-FILE COMPLINT AS DIRECTED BY COURTS
8  Woodcut Media, LTD, et al

PLAINTIFF REQUESTING COURT TO FILE
ENCLOSED COMPLINT AS REMEDY ALSO
9

REQUESTING COURT EXCEPT PL (IFP)
10

STATEMENT (CERDIFY'D) DUE TO PRISON
REFUSING TO FILL OUT APPLICATION.
11

12  TO CLERK OF THE COURT AND HONORABLE JUDGE;

13  Around begging of may, 2025 the plaintiff sent the courts a diversity civil

14  complaint it was sent back to plaintiff with a clerk notice for PL, to

15  use the prison E-filing program the plaintiff tryed the complaint was

16  rejected cdcr argued it was not an initial filing although it was cdcr

17  argued it was stampted and cliamed it looked proccessed although plaintiff

18  provided a copy of clerks notice to file. the plaintiff sent out the

19  complaint to courts pl never seen it agian. so the plaintiff wrote another

20  original sent it to courts who refused agian offering another stamp  but

21  and was dated "june 3, 2025 sent back plaint tryed to e-file cdcr gave

22  the same response refused to E-file plaintiff CDCR issued plaintiff a memo

23  dated june 17 but pl did not recieve it until mid july cdcr argued those

24  complaints are not initial filing memo is enclosed i have also enclosed

25  request forms of me going back for with librarian/clerk & litigations

26  complaints that are stamped or about corcoran staff i have difficulty

27  filing and getting my documents back in a timely manner. im requsting the

28  courts to E-File the complaint i have enclosed i have overly exquasted all

RECEIVED

OCT 14 2025

[1]

available remedys Plaintiff is also requesting courts if courts grant

complaint to be filed by mail if the courts can except plaintiffs (IFP)

application; plaintiff has enclosed a certify'ed statment going back

all the months required from date of the complaint. now cdcr staff are

refusing to file out the application so ive enclosed my certify'd copy

inmate trust account activities transaction statment;

(IFP Request; from six months ive recieved a $100.00¢ dallor hundrede

j-pay but around 80% was taken due to other federal court orders to

withdraw money incoming the j-pay was on 1/09/25, then on 1/17/25  there

was an sales of $19.30¢  on 1/17/25 there was eighty five cents sale

on 1/23/25 $21.55¢ charge for FED-EX  on june 17,25 $two dallors fifty

cents sals for copies  on 5/20/25 sale of $21.60 twenty one dallors

sixty cents. through 1/1/25 to 6/17/25 even befor there was a continuation

of federal court fee withdraws; On 1/1/25 fee taken, agian 1/1/25,1/1/25,

1/1/25, on 2/1/25 four times seperate court orders then fee on 3/11/25

the plaint even going back 1 year more does not did not still doesnt

have the funds on account or any other account to pay fees plaintiff

has enclosed a certify copy of ststment for courts to reiview

(six) 6 exibits are attached to this request.

enclosed with it is a full 25 page compliant encuding exibits.

Date; 10/7/25

Respectfully submitted by;

[2]

Date\Time: 7/15/2025 8:37:48 AM

Institution: COR

# CDCR
## Inmate Statement Report

Verified: COPY OF THE TRUST ACCOUNT MAINTAINED BY THIS OFFICE.
ATTEST:
CALIFORNIA DEPARTMENT OF CORRECTION
*Konaller Acct. 1 (Spc)*
TRUST OFFICER    7/15/25

| CDCR# | Inmate/Group Name | Institution | Unit | Cell/Bed | |
|---|---|---|---|---|---|
| BD0868 | OSUNA, JAIME | COR | 04AA1LC1 | 044001 | |

**Current Available Balance:** $5.37

## Transaction List

| Transaction Date | Institution | Transaction Type | Source Doc# | Receipt#/Check# | Amount | Account Balance |
|---|---|---|---|---|---|---|
| 01/01/2025 | COR | BEGINNING BALANCE | | | | $447.36 |
| 01/01/2025 | COR | FEDERAL FILING FEE | 1:24-CV-01156JLT-EPG | 431490 | ($71.00) | $376.36 |
| 01/01/2025 | COR | FEDERAL FILING FEE | 1:24-CV-01122-KES-SK | 431490 | ($71.00) | $305.36 |
| 01/01/2025 | COR | FEDERAL FILING FEE | 1:24-CV-01009-SAB | 431490 | ($71.00) | $234.36 |
| 01/01/2025 | COR | FEDERAL FILING FEE | 1:24-CV-00793-SAB | 431490 | ($71.00) | $163.36 |
| 01/09/2025 | COR | JPAY | 0000000176225895 | | $100.00 | $263.36 |
| 01/17/2025 | COR | SALES | 9 | | ($19.30) | $244.06 |
| 01/17/2025 | COR | SALES | 26 | | $0.85 | $244.91 |
| 01/23/2025 | COR | SHIPPING CHARGES DUE STATE | #108 FED-EX | | ($21.55) | $223.36 |
| 02/01/2025 | COR | FEDERAL FILING FEE | 1:24-CV-01156JLT-EPG | 431699 | ($10.00) | $213.36 |
| 02/01/2025 | COR | FEDERAL FILING FEE | 1:24-CV-01122-KES-SK | 431699 | ($20.00) | $193.36 |
| 02/01/2025 | COR | FEDERAL FILING FEE | 1:24-CV-01009-SAB | 431699 | ($20.00) | $173.36 |
| 02/01/2025 | COR | FEDERAL FILING FEE | 1:24-CV-00793-SAB | 431699 | ($20.00) | $153.36 |
| 03/11/2025 | COR | FILING FEES DUE STATE | 1:25-CV-00282-EPG | | ($3.00) | $150.36 |
| 03/19/2025 | COR | MISC. INCOME (EXEMPT) | 05-663622 | 12503 | $22.47 | $172.83 |
| 05/20/2025 | COR | SALES | 13 | | ($21.60) | $151.23 |
| 06/17/2025 | COR | LEGAL COPY | #232 SUPPLIES | | ($2.50) | $148.73 |

## Encumbrance List

| Encumbrance Type | Transaction Date | Amount |
|---|---|---|
| Other Encumbrance | 12/13/2022 | $143.36 |

## Obligation List

| Obligation Type | Court Case# | Original Owed Balance | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|
| DAMAGES - STATE PROPERTY | CELL WINDOW 6/7/21 | $143.36 | $0.00 | $0.00 |
| FEDERAL FILING FEE | 1:24-CV-00793-SAB | $350.00 | ($91.00) | $140.20 |
| FEDERAL FILING FEE | 1:24-CV-01009-SAB | $350.00 | ($91.00) | $172.00 |
| FEDERAL FILING FEE | 1:24-CV-01122-KES-SK | $350.00 | ($91.00) | $254.00 |
| FEDERAL FILING FEE | 1:24-CV-01156JLT-EPG | $350.00 | ($81.00) | $269.00 |
| SHIPPING CHARGES | #108 FED-EX | $22.55 | ($21.55) | $1.00 |
| FEDERAL FILING FEE | 1:25-CV-00282-EPG | $350.00 | $0.00 | $350.00 |

2

EXIBIT Z

Date\Time: 7/15/2025 8:37:48 AM    Verified: _____

Institution: COR

**CDCR**

**Inmate Statement Report**

| Restitution List |
| --- |

| Restitution | Court Case# | Status | Original Owed Balance | Interest Accrued | Sum of Tx for Date Range for Oblg | Current Balance |
| --- | --- | --- | --- | --- | --- | --- |
| RESTITUTION FINE | BF139419 | Fulfilled | $300.00 | $0.00 | $0.00 | $0.00 |

THE WITHIN IS A FULL, TRUE & CORRECT
COPY OF THE TRUST ACCOUNT MAINTAINED
BY THIS OFFICE.
ATTEST:
CALIFORNIA DEPARTMENT OF CORRECTIONS
BY _____ (Sac.)
Trust Office
7/15/25

3

EXibiT 3

Date\Time: 7/15/2025 8:37:48 AM

Institution: COR

**CDCR**                     Verified: _____

## Inmate Statement Report

| Start Date: | 1/1/2025 | Revalidation Cycle: | All |
|---|---|---|---|
| End Date: | 7/15/2025 | Housing Unit: | All |
| Inmate/Group#: | BD0868 | | |

COPY OF THE TRUST ACCOUNT MAINTAINED
BY THIS OFFICE.
ATTEST:
CALIFORNIA DEPARTMENT OF CORRECTIONS
BY _____
TRUST OFFICE
7/15/25

1

EXIbITY

State of California                                                     Department of Corrections and Rehabilitation

# Memorandum

Date     :    June 17, 2025

To       :    OSUNA, BD0868
              4A1L-44

Subject :     **E-File Documents**

Your documents could not be E-Filed. Please note, the E-Service Program applies only to
"initial case documents." All other documents can be filed with the Court by mailing the
**documents through the routine legal mail procedures at the institution.** Your E-File
documents have been returned to Education.

Litigation Office
California State Prison-Corcoran

Exibit 5

(EXIP·IT):

STATE OF CALIFORNIA
**INMATE REQUEST FOR INTERVIEW**
GA-22 (Rev. 10/13)

DEPARTMENT OF CORRECTIONS & REHAB

# INMATE REQUEST FOR INTERVIEW

| DATE | TO | FROM (LAST NAME) |
| --- | --- | --- |
| 6/25/25 | LAW LIBRARY | osuna jamie |

| HOUSING | BED NUMBER | WORK ASSIGNMENT | JOB NUMBER | FROM | TO |
| --- | --- | --- | --- | --- | --- |
| 4A-11 | #44 | | | | |

OTHER ASSIGNMENT (SCHOOL, THERAPY, ETC.) | ASSIGNMENT HOURS FROM | TO

Clearly state your reason for requesting this interview.
You will be called in for interview in the near future if the matter cannot be handled by correspondence.

i need my E-filing documents back they dont have to be E-filed now basically after a
i gave you them to filed with no response i wrote a motion to the courts & sent them a
form of the civil complaint with the (PSR) it was granted for me to be relieved from
ng & other orderers were granted i explain the situation they excepted my 1983 through
mail & i recieved a case # so tell litigations not to E-file because if they do there
to be responsible for the filing payment not me i also want to be reimburst for any me
taken off my books for copies if it gets filed i want my original back they had no-ree
ot to E-file they should have not excepted it or should have sent it back to me with n

DO NOT WRITE BELOW THIS LINE

INTERVIEWED BY

DISPOSITION Dan
Litigations    recieved    the    ~filed
On    On    6/13/25    the    other  6/23/25   neither   one
has    been    returned   as   of   today.   You   may   want   to
litigations   to   cancel   filing   if   they   have   have   not   alrea

DATE  6/26/

Exibit 6

(EXIBIT):

STATE OF CALIFORNIA
INMATE REQUEST FOR INTERVIEW
GA-22 (Rev. 10/13)

DEPARTMENT OF CORRECTIONS & REHABILITATION

# INMATE REQUEST FOR INTERVIEW

| DATE | 06/25/25 | TO | Litigation cordinator;p.williams | FROM (LAST NAME) | osuna, jamie | CDCR NUMBER | BD0868 |
|---|---|---|---|---|---|---|---|

| HOUSING | BED NUMBER | WORK ASSIGNMENT | JOB NUMBER | FROM | TO |
|---|---|---|---|---|---|
| 4A-1L | #44 | | | | |

OTHER ASSIGNMENT (SCHOOL, THERAPY, ETC.)   ASSIGNMENT HOURS   FROM   TO

Clearly state your reason for requesting this interview.
You will be called in for interview in the near future if the matter cannot be handled by correspondence.

the motion 1 filed with the eastern district & regarding if they can except & file my 198
& be relieved from the E-filing my motion was granted the 1983 1 sent to courts was filed
in requesting you to return my "ORIGINAL" 1983 to me personally
regardless of the lock down you should of filed it & if you weren't you should have sent

back to me with the reasons so i could of then notify'd the courts but instead you thoug
you found a way to interfear & retaliate but in 10 steps ahead of you return my documents
my complaint was excepted given case number

INTERVIEWED BY _____ DO NOT write below this line, if there appears insufficient write on back

DISPOTION Your docs work been back to the law
Library please request to have them delivered back
I no longer have them

DATE 6/27/25

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jamie Osuna, CDCR #BD0868<br>CSP-COR<br>PO Box 3476<br>Corcoran, CA 93212<br>Pl., | Docket No.:<br><br>State Prisoner<br><br>**DEMAND FOR JURY TRIAL** |
| against<br><br>Woodcut Media, LTD, et al<br>Defs. | **COMPLAINT FOR DECLARATORY, INJUNCTIVE AND FURTHER RELIEF, COMPENSATORY AND PUNITIVE DAMAGES** |

RECEIVED

JUN 09 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY CLERK

For violations of/under:
1. **CA Civ. Code § 45**
2. **CA Civ. Code § 3344**
3. **Copyright Infringement**
4. **CA Constit. Art 1. § 1**
5. **CA BPC § 17500**

## A. JURISDICTION & VENUE

1. This Court has original Federal Question jurisdiction of Plaintiff's action under 28 U.S. Code § 1332; and 17 U.S.C. § 501, et seq., (Copyright). This Court is empowered to grant injunctive relief pursuant to Fed. R. Civ. P. 65, declaratory relief under 28 U.S.C. § 2201, further relief under 28 U.S.C. § 2022, and may exercise supplemental jurisdiction under 28 U.S.C. § 1367.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, actions, omissions giving rise to Pl.'s claims occurred from the United Kingdom while Plaintiff is a citizen and resident of the State of California, which is within this judicial jurisdiction.

## B. INTRODUCTION

3. Plaintiff (Pl.) is a pro se, CSP-COR state prisoner. Pl. brings this complaint seeking damages to remedy injuries from libel; use of likeness; copyright infringement; privacy invasion, making false, misleading statements when promoting Defendant Woodcut Media's (Def.'s) show on Pl.

4. Four out of five of Def. Woodcut Media's ("Woodcut's") interviewees for that production had no personal knowledge about Pl. Def. presented these interviewees as knowledgeable insiders into Pl.'s psychiatric/psychological states and motives, whose statements were in contradiction

1

1    with official records/documents.

2    5. Def. Woodcut expressed their intent to portray Pl. as guilty and dangerous, to harm his

3    reputation. Def.'s audience, the public—Pl.'s jury pool—reacted with hatred, fear, revile for Pl.,

4    pre-determining guilt and calling for the death penalty in 19CM-1882. Inmates, staff, and the

5    public lashed out at Pl., with some credibly threatening Pl. over Def.'s alleged libel.

6    6. Due to Pl.'s intellectual hardship of being under continual PC 2602 orders, schizophrenic-type

7    and other mental illnesses, SHU/RHU housing, Pl. requested and received help in the

8    transcribing/writing of this complaint.

9                                    **C.  PARTIES**

10   7. Pl. Jamie Osuna is a pro-se, state prisoner incarcerated at CSP-COR, Corcoran, CA.

11   8. Def. Woodcut Media, Ltd. is an international media company, headquartered in the U.K.

12   9. Def. Lina Haji is a licensed psychologist living in Florida.

13   10. Def. Ethan Wiley is a citizen living in Texas.

14   11. Def. John/Jane Does were/are Woodcut employees.

15                              **D. FACTUAL ALLEGATIONS**

16   12. Def. Woodcut sent a letter to Pl. [Ex. A.] Def.'s letter stated Def. was "currently in production

17   for a brand-new documentary series which focuses on prisoners and their lives, crimes, and

18   journey through the prison system;" that Def. would "be interviewing several people related to

19   your case including friends, relatives;" and Def. was interested in "conducting a phone

20   interview" with Pl. Pl. did not respond to Def. None of Pl.'s family/friends that Pl. is in contact

21   with participated in Def.'s documentary.

22   13. Def. Woodcut sent Kern County Sheriff's Office (KCSO) a Freedom of Information Act

23   (FOIA) request for "any other information available related to [Pl.'s] incarceration that you

24   have on record;" that "[Def.'s] hope with this series is to highlight some of the fantastic work

25   your department does **and to help keep dangerous criminals such as [Pl.] behind bars**."

26   (Emphasis added.) [Ex. B.]

27   14. KCSO replied to Def. Woodcut that KCSO had "no records related" to one part of the FOIA

28   request and that other records were exempt from release. [Ex. B.]

15. Def. Woodcut posted to the Facebook group Prisoners of the United States, seeking to "speak with anyone who has previously served time with any of the following prisoners." with Pl. listed first. [Ex. D.]

16. Third parties informed Pl. Def. Woodcut released World's Most Evil Prisoners (UK) Episode 7 "Jaime Osuna" [sic]; World's Most Dangerous Prisoners (US), Episode 1 "Osuna." The series was released on television and online through YouTube under multiple channels, Amazon Prime, Channel 5, Apple+ TV, Filmrise, inter alia. The YouTube thumbnail was Pl. juxtaposed next to "pure evil." [1] This was a shock to Pl. given Def.'s letter to Pl.

17. Def. Woodcut published on its official website, "In this chilling series…we unearth little known details of the prisoner and their crimes, in and out of prison." Def.'s YouTube episode description stated, "[Pl.] descends into satanic practices and viscously attacks, tortures, and kills his cellmate." Def. omitted Pl. has not been to trial. Def. used "attack" multiple times in referencing Pl.'s actions, as described herein.

18. Def. Woodcut only included interviewees who expressed hostility against/dislike for Pl.:

19. Def. Woodcut published forensic psychologist Def. Lina Haji ("Haji") as an interviewee. Def. Haji had not contacted Pl. for information prior to her interview/statements regarding Pl. Def. Haji never treated or interacted with Pl. Def. Haji provided through Def. Woodcut a professional, licensed psychological profile/overview of Pl. Def. Haji had access to the public news reports and court records of Pl.'s court-declared incompetencies, in-patient psychiatric hospitalizations, some of Pl.'s medications, various diagnoses, which include schizophrenic-type disorders, PTSD, inter alia. Def. Haji's statements about Pl.'s mental conditions/state were opposite to any of the publicly available, official records, reporting. **Alt. sources for Def. Woodcut to get information:** court records, news reports.

20. Def. Woodcut falsely, without any evidence, published Pl. kept crime scene photos of Y. Peña in Pl.'s cell arranged around a pentagram. Def. Woodcut then published Def. Haji's statements, "So keeping these trophies [the photos], so to speak, definitely helped [Pl.] achieve those goals." (TS 27:03-27:07.) "If you look at [Pl.], he was very attention-seeking. He was there for

---

[1] Source and source for all timestamps (TS) herein: https://youtu.be/ln8zmV_MIO8?si=Cxm0zY73uqGLJotD

*OSUNA V. WOODCUT, LTD*

1  the shock factor. He wanted others to give him credit for his crime. He wanted to be the most
2  outlandish. His ego was huge. He wanted to be the most violent." (TS 32:15-32:29.)
3  21. Def. Woodcut published Def. Haji stating, "Since [Pl.'s] wife had managed to get away and
4  [Pl.] couldn't commit violence against her anymore, he turned to [Y. Peña.]" "I firmly believe
5  that had [Pl.'s] wife not left him, [Pl.] probably would have ultimately killed her." "If he can
6  engage in that with a woman he supposedly loves, it's going to make it a lot easier for him to
7  engage in violence towards anybody else that he comes across with."  "[Pl.'s] level of violence
8  and level of killing is sadistic." (TS 12:09-12:18; 15:50-15:55; 0:41-0:45.) "Nobody is safe
9  around [Pl.] It doesn't matter if you're his wife. It doesn't matter if you're in his gang, not in his
10  gang—if you're his cellmate, if you're in a position of authority, if you're a male or female.
11  Anyone is subjected to be a victim of [Pl.] and that's what makes him so incredibly dangerous."
12  (TS 2:38-2:56.) "[Pl.] was not satisfied with just taking somebody's life. It had to include
13  torture. It had to include sadism. It had to include things that were going to shock other people."
14  (TS 3:29-3:40.) Defs. Woodcut, Haji omitted Pl. did not have a history of violence towards his
15  ex-wife and that the one charge the ex-wife had made was recanted under oath. Defs. omitted
16  the cases of harassment and requests for domestic violence restraining orders filed/requested by
17  others against the ex-wife. (*See* BFL-17-004871, 2017; BCV-15-101375, 2015;
18  S1500CV282387, 2014; Kern County Superior Court.) Defs. Woodcut, Haji had access to these
19  public records. Def. Woodcut omitted any contrary/opposing statements to Haji's assessment.
20  22. Def. Woodcut published Def. Haji stating about Pl.'s plea bargain, "For [Pl.], it probably didn't
21  make a difference whether he pled guilty or not. This was probably him messing with the
22  judicial system, finding another way to exert control, finding another way to inflict pain on [Y.
23  Peña's] family, on the judicial system, on his own family. It doesn't sound like this had
24  anything to do with remorse or pleading guilty because he felt remorse. It had more to do with
25  just making sure that he was in control of everything at all times." (TS 33:42-34:10.) Defs.
26  Woodcut, Haji omitted Pl.'s mental incompetencies, court-ordered psychiatric hospitalization,
27  inter alia, during that case. Def. Woodcut omitted the social media statements by D. (Danielle
28  Peña Gonzales) Baltierra (sister of Y. Peña) who stated she offered/it was her choice to offer the

*OSUNA V. WOODCUT, LTD*

1  plea bargain to Pl. (to halt Pl.'s change of venue motion.) Def. had access to these court records

2  and social media posts. Pl. did not accept the plea bargain to "mess" with the judicial system or

3  to "inflict pain" on others.

4  23. Def. Woodcut included former inmate Def. Ethan Wiley ("Wiley") as an interviewee. Def.

5  Woodcut published, "[Wiley] was also transferred to Corcoran in the same year [as Pl.];" and

6  published Def. Wiley stating, "I ended up at Corcoran Prison after I took a deal and said no

7  contest to voluntary manslaughter, in October of 2017." (TS 37:41-37:57.) **Alt. sources for**

8  **Def. Woodcut to get information:** California Department of Correction's FOIA response

9  showed Wiley was never in CSP-COR with Pl. [Ex. C.] 12/31/2022, Def. Wiley's public

10  Facebook photo of his Inmate Pay Sheet showed Def. was at SATF—not CSP-COR. Def.

11  Woodcut had access to public record and public-setting social media content.

12  24. Def. Woodcut published Def. Wiley managed Pl.'s food trays while at Lerdo County Jail and

13  had access to Pl.'s cell. (TS 27:07-27:14.) This is false. Def. Wiley and Pl. never met/interacted.

14  Inmates at Lerdo County Jail did not have jobs serving food trays when/where Pl. was housed.

15  Def. Wiley did not have access to Pl.'s cell. Def. Woodcut published Def. Wiley stating, "[Pl.]

16  is the most dangerous person **I've ever met.**" (TS 0:31-0:35.) (Emphasis added.)

17  25. Def. Woodcut published, "[Def. Wiley] remembers the time he accompanied a guard to [Pl.'s]

18  cell and discovered the Satanic symbols and pentagrams within." (TS 27:14-27:20) Def.

19  Woodcut published Def. Wiley stating, "The guards opened the door to step in, and I remember

20  my boss taking one step in and stopping. And she described it as just feeling pure evil by

21  stepping into that cell. And she had said that she's been in that cell before, didn't feel anything

22  like that. But after he put those markings up there, she took one step into that cell and backed

23  off. He was allowed to keep them up until they were able to prove that they were blood, which

24  then became a health issue. So, they were able to take them down." (TS 27:14-27:50.) Def.

25  Woodcut published, "As part of his job, [Wiley] eventually came into regular face-to-face

26  contact with [Pl.]" (TS 29:41-29:47.) Def. Woodcut published Wiley stating, "My first

27  encounter with [Pl.] was just a day like any other, you know, handing out trays and then come

28  to [Pl.'s] cell. And [Pl. is] just standing at the window, not smiling. Stood there and stared, not

5

*OSUNA V. WOODCUT, LTD*

at me, not the guards. Just stared. [Pl.] looked intimidating in a different manner than most people are intimidating. It was something about [Pl.'s] presence that you could feel." (TS 29:47-30:16.) "Being around [Pl.], you can't let your guard down, you know? You feel it inside you that if you let your guard down around this person, he's going to do something. **He's the kind of person you would never turn your back on at any time. <u>Some people cannot be rehabilitated</u>.**" (Emphasis added.) (TS 43:10-43:32.) "[Pl.'s] demeanor gave off the feeling that no matter what, if he was able to, he'd kill you without a second thought. It doesn't feel like looking at a person. The guards opened the door to step in, stopping, and described it as just feeling pure evil." (TS 0:45-0:53.) "[Pl.] is beyond evil. If there was a demon incarnate, I would say [Pl.] is it. Evil does not do justice to [Pl.]." (TS 3:51-4:07.) "You could feel hate radiating off of [Pl.], anger and hate. (TS 2:58-3:05) "[Pl.] always, always, always did whatever he could to have fun with the correctional staff and the guards. He'd flood his cell at least once a week, maybe twice a week, just for [bleep] and giggles." (TS 29:05-29:18.) **Alt. sources for Def. Woodcut to get information:** KCSO's procedures/polices are public; Def. Woodcut had access to public record.

26. Def. Woodcut included Pl.'s estranged ex-wife Joelle Castellano ("Castellano") as interviewee "Jane Doe." Castellano and Pl. have been out of contact since when Castellano became a state witness against Pl. **Alt. sources for Def. Woodcut to get information:** public court records.

27. Def. Woodcut published Castellano's statements when these statements contradicted Castellano's other public interviews/comments. This includes Castellano stating she met Pl. through her nephew at a "small party" for her son's high school friends and her nephew is only "8 years apart" from Castellano. (TS 7:01-7:24.) Castellano is 17 years older than Pl. who met her when he was around 19/20. **Alt. sources for Def. Woodcut to get information:** Def. could access birthdates/ages through public online data and Castellano's other interviews. On Witness to the Crime, Castellano stated, "The party ended up being almost 200 children." (2022.) Def. Woodcut published Castellano stating, "The wedding was probably a happy—a really happy day for us." (TS 9:36-9:39.) Castellano's prior interview quoted her referring to Pl. as a "groomzilla." (2019; Nexstar.) Def. omitted there were inconsistencies in Castellano's

*OSUNA V. WOODCUT, LTD*

1    statements.

2    28. Def. Woodcut published, "Pl. became increasingly abusive." (TS 9:52-9:54.) Def. published

3    Castellano stating, "[Pl.] didn't like any man to look at me. Even pregnant, he thought men

4    were checking me out. What the argument started about, it wasn't even serious, but he pushed

5    me. And I was quite heavy, and I fell over, and I broke a rib." (TS 9:55-10:21.) Def. Woodcut

6    published, "[Pl. was arrested] for the attack on his wife. When he got out, a restraining order

7    was placed on him, which meant his wife gave birth to their son without him." (TS 10:35-

8    10:44.) Def. published Castellano stating, "[Pl.] was very angry at me and everyone that he

9    couldn't see the baby born." (TS 10:45-10:51.)  Pl. waited in the hospital during Castellano's C-

10   Section with Pl.'s brother, Castellano's older children. **Alt. sources for Def. Woodcut to get**

11   **information:** these statements contradicted Castellano's testimony and contradicted

12   Castellano's other interviews. Def. Woodcut had access to these records, interviews, witnesses.

13   29. Def. Woodcut published Castellano stating, "That's when [Pl.] would choke me until I fell

14   unconscious;" (TS 11:28-11:34) and "The mental [abuse] was much worse than the physical

15   [abuse.] Horrible mental abuse, controlling, manipulative, gaslighting." (TS 11:57-12:07.) Pl.

16   had not abused Castellano. There were no charges, inter alia, for Castellano's above statements.

17   Castellano was a psychiatric nurse for the CA prison system and around over 17 years older

18   than Pl. (a mentally ill, youth offender, parolee) at their meeting when Pl. was around 19/20

19   years old—around the age of some of her children. Castellano allegedly exercised this power

20   dynamic via threatening to call parole any time Pl. would not do what she wanted; and Pl.'s

21   parole officer warned Pl. about Castellano.

22   30. Def. Woodcut published, "Since the age of 15, [Pl.] also had a track record of domestic

23   violence." (TS 13:35-13:41.) Pl. did not have a track record of domestic violence. The one

24   charge/allegation Castellano filed against Pl. for domestic violence was recanted under oath.

25   Def. omitted information about the recantation. **Alt. sources for Def. Woodcut to get**

26   **information:** Def. had access to these court documents or could have requested Castellano to

27   produce such court documents.

28   31. Def. Woodcut published, "Things came to a head when Osuna turned his violent behavior on

7

*OSUNA V. WOODCUT, LTD*

1  his wife's other son, pushing him off a bed and onto the floor. She decided enough was enough

2  and kicked him out of the house they were sharing." (TS 12:20-12:33.) Pl. never pushed a child

3  off the bed and had never abused any of Castellano's children. Pl. has no child abuse charges.

4  Def. Woodcut omitted this fact. **Alt. sources for Def. Woodcut to get information:**

5  Police/court records show Castellano arrests/charges for child abuse, drugs. (*See* BM810457A;

6  Kern County Superior Court; 2012; inter alia) Def. had access to these court/arrest records. Def.

7  omitted these facts.

8  32. Def. Woodcut published Castellano stating, "Once I got rid of [Pl.], [he] would continuously

9  call me on the phone threatening me and threatening me, talking about [Pl. was] going to kill

10  me, [Pl. was] going to do this." [sic.] (TS 12:33-12:43.) "After a standoff, [Pl.] was arrested,

11  and [Pl.] didn't have a grenade. [Pl.] was just saying that. [Pl.] ultimately just gave up." (TS

12  19:44-19:56.) **Alt. sources for Def. Woodcut to get information:** Castellano contradicted her

13  statements from her prior interview on Witness to the Crime, that she had been encouraging Pl.

14  via phone to do "suicide by cop," that Pl. was "super high," and she "kept telling him to just

15  turn [himself] in." Def. omitted there were contradictions.

16  33. Def. Woodcut published Castellano stating Pl. made statements to Castellano about necrophilia

17  and drug use. (TS 21:52-22:08.) Pl. never stated this to Castellano. Castellano failed to make

18  these accusations in prior interviews or testimony.

19  34. Def. Woodcut published Castellano stating, "I saw very many scars, large scars on his forearm.

20  Of course, it was shocking to me. But I didn't really feel afraid because it's through plexiglass

21  and he's handcuffed. I didn't feel like he could harm me." (TS 22:42-23:02.) "[Pl.] proceeded to

22  tell me that he really wanted to kill me, but he couldn't because he would think of our son when

23  he was choking me. And I asked him, 'What did you do to her?' And he didn't verbally say it,

24  but he motioned with his hand around the neck." (TS 23:08-23:35.) Pl. had not done this. **Alt.**

25  **sources for Def. Woodcut to get information:** Castellano's statements contradicted

26  Castellano's prior statement that Castellano would not "have been able to sit in that room [with

27  Pl.] I don't care how bolted down he was'" (Nexstar; 2019.) Def. had access to Castellano's

28  conflicting public statements. Def. omitted there were any inconsistencies/contradictions in

*OSUNA V. WOODCUT, LTD*

1    Castellano's statements.

2    35. Def. published Castellano stating, "[Pl.] told me that [Y. Peña] resembled me and reminded him

3    of me." (TS 34:54-35:04.) "And he said it, like, real monotone. And he said, 'You're next.

4    You're next. She reminded me of you. Now I know I could kill you.'" (TS 15:39-15:47.) "[Pl.]

5    was continually] calling me, threatening me. You know, a snitch. He's going to kill me next. He

6    killed her because we resembled each other." (TS 18:35-18:39.) **Alt. sources for Def. Woodcut**

7    **to get information:** Castellano, a blonde, Italian White woman, with larger/lip fillers and larger

8    nose, had not resembled Y. Peña, a dark-haired, thin-lipped, small-nosed, Hispanic woman.

9    Def. Woodcut had access to publicly available photos of Castellano and Y. Peña. Def. Woodcut

10   omitted stating/pointing out this difference in appearance.

11   36. Def. Woodcut published Castellano stating, "And [Pl.] said [Pl.] was doing it to delay his trial

12   because [Pl.] didn't feel safe going to the prison system. because of what he did to [Y. Peña.]"

13   (TS 25:24-25:30.) Pl. had never stated this to Castellano, and this is not true. **Alt. sources for**

14   **Def. Woodcut to get information:** Def. Woodcut had access to court reports showing Pl. was

15   court-ordered hospitalized and forced medicated, that Pl. fought against his lawyer/proceedings,

16   moved for a *Marsden* hearing, inter alia. Def. omitted these facts.

17   37. Def. Woodcut published Castellano stating, "[Pl.] also sent me [a letter] with a dead rat in it. I

18   never opened the entire content of the letter." (TS 30:50-30:57.) Def. omitted this was not

19   proven, omitted how it would have passed jail mailroom censors/USPS. Def. omitted the

20   prosecution "lost" the envelope (and other alleged prosecutorial misconduct.) **Alt. sources for**

21   **Def. Woodcut to get information:** Def. had access to public court records. Def. omitted these

22   facts.

23   38. Def. Woodcut published, "[Pl.] had been in Corcoran prison for almost two years when he got a

24   new cellmate;" "[Pl.] took immediate offense to sharing a cell with him **and did the thing he**

25   **did best.**" (Emphasis added.) (TS 38:11-38:20; 38:31-38:36.) **Alt. sources for Def. Woodcut**

26   **to get information:** Pl. transferred to Corcoran in or around 08/2018 and was celled with Luis

27   Romero in or around 03/2019. Def. had access to this public information or could have made a

28   FOIA inquiry to the California Department of Corrections.

9                                                    *OSUNA V. WOODCUT, LTD*

39. Def. Woodcut published, "Adding to the savagery of the murder was the fact that [Pl.] had managed to do this with just a small razor." (TS 40:00-40:07.) This statement was based on rumor/unfounded assumption. Def. omitted any details about Luis Romero's CDCR-documented history violent, unprovoked attacks on his cellmates, in-prison charge/case. **Alt. sources for Def. Woodcut to get information:** Def. Woodcut had access to the public court records, parole hearing transcripts, similar documents.

40. Def. Woodcut included private investigator Paul Lopez ("Lopez"), as an interviewee. Def. Woodcut published Lopez's descriptions of Y. Peña/Pl.'s first case. (TS 14:20-14:26.) Def. omitted publicly available information about Y. Peña, including the domestic violence restraining order taken out against her (*See* S1501FL601148; Kern County Superior), multiple felonies, the loss of custody of her all her children; her family ties with the Loma Bakers gang and some of those family gang member ties to the motel/motel's owner featured in Def. Woodcut's episode on Pl., and omitted the Peña family's arrests/felony charges, gang ties. **Alt. sources for Def. Woodcut to get information:** Def. had access to public records, social media content.

41. Def. Woodcut published Lopez describing various alleged injuries of Y. Peña. There is no evidence, including the autopsy report for some descriptions, which appear to be exaggerated rumors and is false. (TS 14:20-14:29; 14:44:15:23.) **Alt. sources for Def. Woodcut to get information:** Def. omitted the medical examiner could not determine whether injuries were antemortem, or postmortem, lividity, contradicted his testimony during Pl.'s preliminary hearing and used unscientific methods, has a history of vacated cases, challenges, complaints, litigation, was arrested due to fraud, inter alia. Def. had access to public court documents, news reports.

42. Def. Woodcut published Lopez stating, "[Pl.] was in Lerdo for an extended period of time. His first stop was in C Pod unit three, which is designated as a psychiatric unit. C Pod is definitely the most secure pod and also by far, for correctional officers, the most dangerous pod to work." (TS 20:45-21:05.) **Alt. sources for Def. Woodcut to get information:** KCSO exempted Pl.'s incarceration records. [Ex. B.] Def. omitted information about the exemption and published

10                                    *OSUNA V. WOODCUT, LTD*

1    rumor, unsupported belief about Pl.'s housing.

2    43. Def. Woodcut published, "While waiting for a trial date, [Pl.] attempted to kill for a second

3    time." (TS 23:45-23:49.) Def. published Lopez stating, "[Pl.] was involved in an altercation

4    with an inmate over being too loud. [Pl.] armed himself with a shank known as a tomahawk."

5    (TS 23:50-23:58.) "[Pl.] throws a punch at the other individual who is much larger than [Pl.].

6    The inmate responded by blocking the punch and striking [Pl.] several times knocking him to

7    the ground at which point the inmate felt something wet and realized that he was bleeding

8    profusely;" "This wasn't just a jailhouse brawl. [Pl.] wanted to make a point. You don't do that

9    to somebody unless you're trying to take their life." (TS 24:18-24:40; 24:51-24:58.) **Alt.**

10   **sources for Def. Woodcut to get information:** These statements contradict the incident

11   report/record, which provided former inmate Jose Oliva approached, punched Pl. in the face. Pl.

12   cut Jose Oliva with a dull tool found in the cell (not a "tomahawk") in self-defense. Pl.'s

13   defense attorney considered the incident as Pl.'s self-defense. Jose Oliva had an alleged history

14   of unprovoked attacking/assaulting other inmates. Defs. Woodcut omitted this information.

15   44. Def. Woodcut published former CDCR lieutenant Hector Bravo Ferrel ("Ferrel") stating, "[Pl.]

16   took out pieces of [Luis Romero's] intestines and hung them from the light fixture. You could

17   see them hanging. And the investigators even found a sandwich sitting inside of a bowl on his

18   desk that had human remains in there half-eaten." (TS 39:09-39:27.) This was based off rumor,

19   unsupported belief. **Alt. sources for Def. Woodcut to get information:** Def. omitted Ferrel

20   had never worked in facility with/over Pl. Ferrel's public statements/interviews, or the

21   California Department of Corrections FOIA request process were available to Def. Def. then

22   published Lopez stating, "[Pl.] uses Luis Romero's blood to write different statements on the

23   prison wall. And one of the statements he writes is, 'I'm a man of a thousand faces.' What

24   appears to be hanging around [Pl.'s] neck when he's removed from the cell appears to be body

25   parts or organs that he made into a makeshift necklace. Again, I'm not a doctor, but it looks like

26   possibly the intestine of Mr. Romero." (TS 39:32-39:52.) These statements are based on rumors

27   and unsupported beliefs.

28   45. Def. Woodcut published Lopez stating, "[Pl.] had a pentagram that he drew on the cell floor,

11

*OSUNA V. WOODCUT, LTD*

1    and he had pictures, crime scene photographs of Y. Peña, which he laid around the pentagram

2    graphic. He used those as trophies, and he said something similar to the gang coordinator, like,

3    because 'Now, the bitch can worship her god,' which [Pl.] thinks that's what [Pl.] is." (TS

4    26:30-26:55.) Pl. did not have photos/crime scene photos of Y. Peña laid around a pentagram

5    drawn on his cell floor. Pl. did not have any photos/crime scene photos of Y. Peña in Pl.'s

6    possession. Def. had made no such statements to any gang coordinator. Def. Woodcut had no

7    supporting/credible evidence for these statements.

8    46. Def. Woodcut published Lopez stating, "[Pl.] also had killed a mouse, and he peeled the skin

9    off of the mouse or most of the skin just to the point to where it was thin enough to where he

10   could maintain the skeletal structure. And he posed the mouse on its back feet and left it there

11   for months." (29:19-29:40.) Pl. had not done this. Def. Woodcut had no supporting/credible

12   evidence for these statements.

13   47. Def. Woodcut published Lopez stating, "Luis Romero was a convicted murderer that was

14   ultimately sent to Corcoran prison serving a 27-year sentence, and he was close to being

15   paroled." (TS 38:20-38:30.) **Alt. sources for Def. Woodcut to get information:** Luis

16   Romero's most recent parole hearing showed Luis Romero's parole was denied for at least

17   another decade due to his "still acting violently" **against other inmates**, and he could be

18   deported. (07/09/2015; CA Parole Board Decision; 4:11-17; 6:21-23.) Def. Woodcut had access

19   to CA parole hearings public record, court documents. Def. omitted these facts.

20   48. Def. Woodcut published Lopez stating, "The brutality of this crime is almost unparalleled. I've

21   been a police officer for 28 years, retired now, and I've seen some horrible things, but I have

22   never seen anybody do that. And that's something, even looking at the pictures, you're never

23   going to unsee." (TS 41:48-42:07.) **Alt. sources for Def. Woodcut to get information:** The

24   crime scene photos are under a Kings County Superior Court protective/seal order. Def. omitted

25   this information and published such statements as Def. Haji's, "I think there's a shock factor. I

26   want to be the worst. I want to be the most egregious. I want people to remember me. It's a way

27   to be commemorated as the most violent criminal in the world." (TS 42:17-42:22.)

28   49. After Def. Woodcut told KCSO Def.'s production was **"to help keep dangerous criminals**

                                                    12                      *OSUNA V. WOODCUT, LTD*

1    such as [Pl.] behind bars," Def. Woodcut published the following without including opposing

2    views (any emphasis added):

3    50. "[Pl.] is unequivocally, unparallelly **a highly dangerous human that, in my opinion, will kill**

4    **again given the first opportunity.**" (TS 42:58-43:09.) "You can't have someone like Jaime

5    Osuna [Pl.] in general population because he's a **cold-blooded, calculated killer,** self-

6    proclaimed devil worshiper who mutilates bodies and clearly stated on more than one occasion

7    that if given the opportunity, and if he feels like it, **he will just simply take life to take life.**"

8    (TS 43:44-44:07.) "So, I would never want to see [Pl.] again face-to-face or released or ever

9    **near society or even other cellmates or inmates.** (TS 3:41-3:51.) "**I don't think [Pl. is] a**

10   **person at all. I think [Pl.'s] a monster, evil.** The way he conducts himself against fellow

11   inmates and staff members is extremely violent, extremely deranged. I would say he's

12   deranged." (TS 43:32-43:46.) "**[Pl. is] never going to stop. [Pl. is] always going to continue**

13   **to kill at every possible chance that he gets.**" (TS 44:07-44:13.)

**E. CAUSES OF ACTION**

15   51. Pl. realleges and incorporates paragraphs 1-50 as though fully set herein.

16   52. The actions of Def. Woodcut in taking deliberate, malicious, intentionally harmful adverse

17   actions against Pl. in publishing slanderous material was premediated by Def. Woodcut.

18   While in the middle of production for *World's Most Evil/Dangerous Prisoners,* Def. Woodcut

19   had sent an inquiry to KCSO stating Def. wanted to "**help keep dangerous criminals like**

20   **Jamie Osuna behind bars.**" (Emphasis added.) This comment/plan of Def. Woodcut was a

21   premediated plan to construct and provide to the public a storyline that would be told and had

22   been told with intention of making the public—Pl. 's jury pool for an open potential death

23   penalty case—afraid of and prejudiced against Pl. Def. Woodcut knew or it is reasonable for

24   Def. Woodcut to have known that this storyline would taint public opinion and had/has the

25   potential to taint any jury pool. Def. Woodcut maliciously, strategically planned to create Def.

26   Woodcut's production to keep specific prisoners—Pl.—"behind bars." Def. Woodcut told

27   Pl.'s story by willfully, wantonly choosing to tell lies, inaccuracies, contradictions, yet Def.

28   Woodcut had other, official, credible sources, such as court documents, from where to get

accurate facts. Def. Woodcut failed to do so. Def. Woodcut instead willfully, wantonly

exhibited reckless disregard for the truth, published lies, including publishing that Pl.

committed crimes Pl. was never charged for (e.g. child abuse, necrophilia, inter alia) without

any supporting evidence. Def. Woodcut willfully, recklessly, wantonly used sources that

public record showed did not actually know Pl., were not in the same facility as Pl., were

unreliable, inter alia. Def. Woodcut 's decisions/choices to omit public record information, to

use unreliable sources was intentional—meant to deceive and convince the public that these

interviewees/sources would "unearth little known details" no other media or individual knew.

This deception led to views/downloads of Def. Woodcut's production about Pl.

53. Def. Woodcut purposefully defrauded the public with lies, betraying the public's trust. Def.

Woodcut's actions have caused, causes, will cause serious damage and harm to Pl.'s safety, to

Pl.'s due process, his liberties, his conditions of confinement, and has further caused Pl.'s

social alienation. Def. Woodcut knew or it was reasonable for Def. Woodcut to know of this

harm and credible threat to Pl.'s safety not only from Def. Woodcut's background of

research/productions on prisoners/crime, but also by publishing such an acknowledgement in

Def. Woodcut's episode, "Even in prison, they do have their own ethical code, and they do

have their own rules. And violence against children is at the absolute bottom level. Violence

against women is a close second. You're in prison and you're scared for your life. The idea

behind that is you chose to engage in this behavior. You chose to engage in this crime and so

now you have to deal with the consequences." (TS 25:34-25:54.)

54. Def. Woodcut is responsible for the injuries Pl. suffered, suffers, will suffer because Def.

Woodcut intentionally and maliciously planned to present a false narrative—one that would,

as Def. Woodcut told KCSO, "help keep dangerous prisoners like [Pl.] behind bars." Def.

Woodcut knowingly published their storyline that would likely get Pl. attacked via assuming

Pl. was a child/woman abuser, inter alia, as Def. Woodcut falsely, wantonly, recklessly

published for financial gain. Pl. would not have suffered, will be suffering these

damages/injuries if not for Def. Woodcut's actions.

55. As a direct result of Def. Woodcut 's actions, Pl. suffered in the forms of severe emotional

14                              *OSUNA V. WOODCUT, LTD*

1    distress, mental anguish, loss of liberties, infringed upon due process, violations of personal

2    rights, and threats to personal safety, and injuries. Since Def. Woodcut's production, various

3    inmates now rely on Def. Woodcut's production regarding Pl. and have been calling Pl. a

4    child/woman abuser, inter alia, making inflammatory comments/threats, inter alia. Def.

5    Woodcut's actions thus set a target on Pl., which now limits his access to certain prisons, so

6    that Pl. is confined in solitary confinement.

7    56. The false information Def. Woodcut had wantonly, recklessly published caused prison staff to

8        become biased toward Pl., so that Pl.'s treatment medical team and custody poorly treat Pl.,

9        after believing Def. Woodcut's production on Pl. Even a unit staff member referenced Def.

10       Woodcut's work, told inmates on Pl.'s tier Def. Woodcut's published lies. This has also

11       violated Pl.'s due process in court, where it has affected Pl.'s ability to do a change of venue

12       and has affected individuals handling Pl.'s case in the manners herein described, making them

13       have the presumption of Pl.'s guilt, that Pl. "attacks" others. It has further caused social

14       alienation between Pl. and Pl.'s friends/family from believing Def. Woodcut's production. It

15       has caused Pl. to frequently be threatened/harassed by other inmates, causing Pl., who is

16       diagnosed with serious mental illnesses, to decompensate and have symptoms of his disorder

17       triggered, causing physical injuries to Pl. Pl., a qualified mentally ill offender, has been

18       diagnosed with schizophrenia-type mental illnesses, psychotic disorder, PTSD, which has been

19       triggered by the inmates', others' reactions to Def. Woodcut's work, as is documented by Pl.'s

20       mental health treatment team.

21    **FIRST CLAIM: CA CIVIL CODE § 45; LIBEL, LIBEL PER SE**

22    57. Pl. realleges and incorporates paragraphs 1-56 as though fully set herein.

23    58. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

24        criminals such as [Pl.] behind bars," in publishing Pl. pushed a child off a bed onto the floor,

25        when Pl. had never done this, and there are no records/charges for such an allegation, and

26        there was evidence of Castellano's unreliability, was **libel per se** under CA Civ. Code § 45.

27    59. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

28        criminals such as [Pl.] behind bars," in publishing Pl. had a history of domestic violence and

1    abused Castellano, when the one allegation against Pl. was recanted under oath, and there was

2    evidence of Castellano's unreliability, committed **libel per se** under CA Civ. Code § 45.

3    60. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

4    criminals such as [Pl.] behind bars," in publishing Pl. threatened Castellano's life as "next,"

5    had stated to Castellano details/gave motive about Y. Peña when Pl. had never done this, and

6    when Def. had access to Castellano's history contradictory statements and hostility towards

7    Pl., directly resulted in inmates credibly threatening Pl. Def. committed **libel per se** under CA

8    Civ. Code § 45.

9    61. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

10    criminals such as [Pl.] behind bars," in publishing Pl.] had a pentagram with photos of Y.

11    Peña laid around it as trophies publishing that it was so the "bitch can worship her god" when

12    there is no evidence to support this and it had never happened, irreparably harming Pl.'s

13    reputation with negatively influencing public/staff, causing Pl. extreme emotional distress,

14    committed **libel** under CA Civ. Code § 45. A reasonable man in Pl.'s position would have

15    experienced extreme emotional distress.

16    62. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

17    criminals such as [Pl.] behind bars," in publishing that "[Pl.] took immediate offense to

18    sharing a cell with [Luis Romero] and did the thing [Pl.] did best," that [Pl.] "viscously

19    attacks, tortures, and kills his cellmate," that Pl. hung intestines from the light fixture, inter

20    alia, when no such information about 19CM-1882 has been to trial/released was **libel per se**

21    under CA Civ. Code § 45.

22    63. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

23    criminals such as [Pl.] behind bars," in publishing Pl. had killed, flayed, posed a mouse for

24    months, when Pl. had not done this and there is no evidence supporting this statement, Def.

25    committed **libel per se** under CA Civ. Code § 45.

26    64. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

27    criminals such as [Pl.] behind bars," in publishing [Pl.] was the aggressor in a jail fight was

28

1    "trying to take [Jose Oliva's] life" when record shows Pl. was attacked and acting in self-

2    defense was **libel per se** under CA Civ. Code § 45.

3    65. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

4    criminals such as [Pl.] behind bars," in publishing Pl. committed necrophilia when Pl. had not

5    done this and was not charged with such a crime, and when Castellano had a known history of

6    unreliability, was libel **per se** under CA Civ. Code § 45.

7    66. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

8    criminals such as [Pl.] behind bars," in publishing Def. Wiley personally knew/interacted with

9    Pl. to contribute to/enabled Def. Woodcut's characterization of Pl. as dangerous, "evil," "evil

10   incarnate," inter alia, that Pl. will "attack" anyone and "cannot be rehabilitated," when Pl.

11   and Def. Wiley had never interacted/met, and records show Def. Wiley was unreliable,

12   harming Pl.'s reputation with negatively influencing public/staff, causing Pl. extreme

13   emotional distress, committed **libel** under CA Civ. Code § 45. A reasonable man in Pl.'s

14   position would have experienced extreme emotional distress.

15   67. Def. Woodcut's actions, after Def. stated Def.'s intention was "to help keep dangerous

16   criminals such as [Pl.] behind bars," in publishing such statements without any opposing

17   views through their work that "nobody is safe around [Pl.]," that "anyone is subjected to be a

18   victim of [Pl.] and that's what makes him so incredibly dangerous," "I don't think [Pl. is] a

19   person at all. I think [Pl.'s] a monster, evil;" that Pl. is "cold-blooded, calculated killer," that

20   "[Pl. is] never going to stop. [Pl. is] always going to continue to kill at every possible chance

21   that he gets;" that "[Pl. is] the kind of person you would never turn your back on at any time.

22   Some people cannot be rehabilitated;" that Pl. is "evil incarnate;" harming Pl.'s reputation

23   with negatively influencing public/staff, causing Pl. extreme emotional distress, committed

24   **libel** under CA Civ. Code § 45. A reasonable man in Pl.'s position would have experienced

25   extreme emotional distress.

26   68. Def. Haji's actions, after Def. Woodcut stated Def. Woodcut's intention was "to help keep

27   dangerous criminals such as [Pl.] behind bars," in publishing that Pl.'s plea bargain was Pl.

28   "messing with the judicial system, finding another way to exert control, finding another way

17                                    *OSUNA V. WOODCUT, LTD*

1  to inflict pain," when Pl. did not accept the plea bargain to "mess with" or "inflict pain" on

2  any system/person, harmed Pl.'s reputation with negatively influencing public/staff, causing

3  Pl. extreme emotional distress, committed **libel** under CA Civ. Code § 45. A reasonable man

4  in Pl.'s position would have experienced extreme emotional distress.

5  69. Def. Haji's actions, when she had access to court reports and news reports regarding Pl.'s

6  mental diagnoses, incompetencies, mental health/sanity issues, in providing a licensed,

7  professional assessment of Pl. that was directly opposite to such documents, omitting

8  reference to such documents/mental health, inter alia, as herein described, and stating that Pl.

9  was attention seeking/narcissistic, and stating without any credible evidence that Pl. had

10  photos of Y. Pena around a pentagram as "trophies," that Pl. had committed violence on Y.

11  Pena in place of Castellano and would have killed Castellano, that it didn't matter who you

12  were that Pl. would attack/harm you, that in accepting a plea bargain Pl. was only "messing"

13  with the judicial system and did it to "inflict pain" on others, inter alia, was in grossly

14  exceeded of the scope and ethics of her state licensure, was in reckless disregard for the truth,

15  committed **libel per se** under CA Civ. Code § 45.

16  70. Def. Wiley's actions in falsely stating that he personally met and interacted with Pl., in falsely

17  stating that he had been in Corcoran with Pl., and then using such false statements to give

18  credibility to his statements that Pl. riled up staff with flooding his cell, had pentagrams of

19  blood on the walls, that Pl. was evil incarnate, that you could not let your guard down around

20  Pl., and that Pl. could not be rehabilitated, inter alia, was malicious and wanton and caused Pl.

21  extreme emotional distress, has irreparably harmed his reputation. A reasonable man in Pl.'s

22  position would have experienced extreme emotional distress. Def. committed libel under CA

23  Civ. Code 45.

24  71. Def. Woodcut, having editorial control, exhibited negligence when Def. failed to exercise

25  reasonable care to verify statements and instead ratified the libelous materials cited above of

26  this claim, Claim One, which Def.'s staff curated, edited, produced for/when acting within the

27  scope of their employment. Def. Woodcut continued/continues republishing,

28  distributing/licensing, creating derivatives of, inter alia, this material even when on notice of

1    falsities, biases against Pl., inter alia, and did/do so with an intent to further Def. Woodcut's

2    financial gain. Def. Woodcut under the doctrine of respondeat superior is liable respectively

3    for **libel** or **libel per se** under CA Civ. Code § 45.

4                    <u>**SECOND CLAIM**</u>: CA CIV. CODE § 3344; FOR USE OF LIKENESS

5    72. Pl. realleges and incorporates paragraphs 1-71 as though fully set herein.

6    73. Def. Woodcut's actions, without Pl.'s permission, in using Pl.'s likeness for, and in promotion

7        of, *Osuna/Jamie Osuna* media products, derivatives of, inter alia, that Def. created for

8        financial gain with the intention "to help keep dangerous criminals such as [Pl.] behind bars,"

9        and which Def. had exhibited reckless disregard for the truth in producing, and which was

10       inflammatory, libelous and put a target on Pl., as herein alleged and described, is liable under

11       CA Civ. Code § 3344.

12                    <u>**THIRD CLAIM**</u>: 17 U.S.C. § 501, ET SEQ., FOR COPYRIGHT

13   74.  Pl. realleges and incorporates paragraphs 1-73 as though fully set herein.

14   75. Def. Woodcut's actions, without Pl.'s authorization, in publishing Pl.'s private letters/art

15       violated Pl.'s copyright when Pl. is the sole owner of the copyright in an original work that is

16       fixed in tangible media of expression under TXu002471802. Pl. is the holder of the exclusive

17       rights under 17 U.S.C. § 101 et. seq., and all amendments thereto, (the "Copyright Act"), to

18       reproduce, distribute, license any reproduction, display, inter alia, Pl.'s work. Def. Woodcut's

19       acts violated Pl.'s exclusive rights under 17 U.S.C. §§ 106, 501. Def. Woodcut infringed on

20       Pl.'s copyright with an intent to financially gain. Based on Def. Woodcut's unlawful,

21       infringing actions alleged herein, Pl. is entitled to injunctive relief, Def. Woodcut's profits, or

22       at Pl.'s election, statutory damages pursuant under 17 U.S.C. §§ 502, 504(b), (c).

23                    <u>**FOURTH CLAIM**</u>: CAL. CONST. ART. 1, § 1; PRIVACY CLAUSE

24   76.  Pl. realleges and incorporates paragraphs 1-75 as though fully set herein.

25   77. Def. Woodcut's actions, after Def. Woodcut expressed their premediated plan of portraying

26       Pl. as unredeemable/cannot be rehabilitated in an inflammatory, derogatory, libelous work, as

27       herein alleged, in publishing private photos of Pl. with Pl.'s newborn, private photos of Pl. in

28       his home, other previously non-published, private photos of Pl., and which photos were used

                                    19                    *OSUNA V. WOODCUT, LTD*

1    for/in Def. Woodcut's material that exhibited reckless disregard for the truth, and doing this

2    when Def. Woodcut had access to public-access photos of Pl., such as mugshots or court

3    room footage as an alternative, was a serious and unwarranted invasion of privacy and had

4    wantonly violated Pl.'s right to privacy guaranteed under Cal. Const. Art. 1, § 1.

5    **FIFTH CLAIM: CA BPC 17500; FOR FALSE AND MISLEADING STATEMENTS IN**

6    **ADVERTISING**

7    78. Pl. realleges and incorporates paragraphs 1-77 as though fully set herein.

8    79. Def. Woodcut's actions in publishing that Def. Woodcut 's TV series will "unearth little

9    known details of the prisoner and their crimes, in and out of prison," and this after Def.

10   published on Facebook to ask anyone to contact Def. Woodcut about knowing Pl., had clearly

11   not verified statements provided to Def. during interviews, and this after Def. Woodcut stated

12   to Pl. that Def. Woodcut was including Pl.'s "friends, relatives" in the production, and this

13   after Def. Woodcut informed KCSO that Def. Woodcut's intention was to "to help keep

14   dangerous criminals such as [Pl.] behind bars," was false, misleading about Def. Woodcut's

15   media product on Pl. This false, misleading advertisement of a media product using, without

16   Pl.'s permission, Pl.'s likeness and copyright materials, and which Def. Woodcut advertised as

17   being the truth/accurate, has irreparably harmed Pl.'s reputation and has directly resulted in

18   death/harm threats against Pl. by Def. Woodcut's audience, and resulted in the audience's

19   prejudice of Pl.'s guilt over Def. Woodcut's various accusations/allegations, causing Pl.

20   extreme emotional distress. Any reasonable man in Pl.'s position would have experienced

21   extreme emotional distress at such false advertising using their likeness. Def. Woodcut is liable

22   under BPC § 17500.

23   **F.  PRAYER FOR RELIEF**

24   WHEREFORE, Pl. respectfully requests that the Court grant the following relief:

25   A. **Issue declaratory judgments;**

26   B. **Issue compensatory damages:**

27   a. For compensatory damages in an amount to be proven at trial.

28   b. For all nominal damages.

*OSUNA V. WOODCUT, LTD*

1    c. For any additional general and or specific, consequential and or incidental damages in an

2    amount to be proven at trial.

3    d. For all punitive damages in an amount appropriate to punish the Def. and make an example of

4    the Def. to the community.

5    e. For all interests, where/as permitted by law.

6    f. Disgorging of profits from these episodes, derivatives, licenses/distribution of, inter alia.

7    **C. Issue injunctions ordering:**

8    g. For any of Def. Woodcut's materials that infringe on Pl.'s copyrights and any other materials

9    that contain or embody copies of Pl.'s original works be impounded pursuant to 17 U.S.C. §

10    503; materials found infringing on Pl.'s copyrights, as well as any other that contain

11    embodiments of Pl.'s original works be destroyed pursuant to 17 U.S.C. § 503.

12    h. For an order to remove from all platforms the full length, any previews, clips of any length, any

13    derivatives of, licensing/distribution of, inter alia, Def. Woodcut's production on Pl. during

14    pendency of this trial, and if found against for libel, permanently thereafter.

15    i. For an order for Def. Woodcut to issue an apology to Pl. across all of Def.'s platforms.

16    j. For an order to remove of reference to the episode from Def. Woodcut's IMDB or similar

17    listing/detail site.

18    **D. Grant any such other relief as it may appear that Pl. is entitled.**

19    Respectfully submitted on May 12, 2025,

20

21

22    p.p. Jamie Osuna, CDCR # BD0868

23

24

25

26

27

28

21

*OSUNA V. WOODCUT, LTD*

EX. A



**Osuna, Jaime, CDC#BD0868**
**California State Prison, Corcoran**
**P.O. Box 8800**
**Corcoran, CA, 93212-8309**
**UNITED STATES**

**23rd February 2023**

Hi Jaime,

I'm Liam and I work for a TV company called Woodcut Media, one of the lead-ing producers of true crime documentaries in the UK.

We also produce programmes for a wide range of US broadcasters including Discovery, National Geographic, A&E, Oxygen, Sky and Prime Video.

We're currently in production for a brand-new documentary series which fo-cuses on prisoners and their lives, crimes, and journey through the prison sys-tem.

In our upcoming series, we intend to feature your story and will be interview-ing several people related to your case including friends, relatives, experts, journalists, and members of law enforcement.

We would like to produce a real 360 overview of your case and it would be great to have you involved. We are aware of California's prison policy which pro-hibits news media from visiting and filming inmates so we would potentially look at conducting a phone interview with you.

I look forward to hearing from you.

Best,
Liam

**Ex. Pg. 1**

Registered Office: Wessex House, Upper Market Street, Eastleigh, Hampshire, SO50 9FD

EX. B

Sent: 05/05/2023 10:34 AM
To: robert.kilburn@woodcutmedia.com
From: "MaryClaire Walsh (Kern County Sheriff, CA)"
Subject: RR-2023-183 Records Request Dated: 4/27/2023



*SHERIFF'S OFFICE - COUNTY OF KERN*
*DONNY YOUNGBLOOD*
*Sheriff-Coroner Public Administrator*
*1350 Norris Road*
*Bakersfield, CA 93308-2231*

Dear Mr. Kilburn:

Please consider this email the Kern County Sheriff's Office response to your 4/27/2023 request for records.  For reference your request is set forth below:

- I'm a researcher for a U.K based factual T.V production company. I'm currently working on a broadcast documentary series that looks at a number of the worlds most dangerous prisoners. For this I am looking into the case of Jamie Osuna. Who murdered Yvette Pena in 2011 and was housed at Kern County Jail. I'd like to request his arrest records, bodycam, CCTV, police interviews, audio, 911 calls, photographs, archive material and any relevant documents relating to this case. I'd like to request any other information available related to his incarceration that you have on record. Our hope with this series is to highlight some of the fantastic work your department does and to help keep dangerous criminals such as Osuna behind bars. Thank you we appreciate and look forward to your co-operation. Many thanks, Rob.

The KCSO has no records related to the murder of Yvette Pena.  You may wish to reach out to the Bakersfield Police Department for the records you seek.  As to records related to the incarceration of Jamie Osuna,  records of criminal history information are confidential and therefore exempt from disclosure pursuant to California Government Code § 7927.705, Cal. Const. Art. 1 § 1, and California Penal Code § 13300, and Evidence Code § 1040.  Based on the foregoing, no records will be disclosed.

With the transmission of this response letter, the KCSO will consider its response to your request completed.  If you have any questions please feel free to contact me.

MaryClaire Walsh
Civil Litigation Coordinator
Kern County Sheriff's Office
1350 Norris Road
Bakersfield, CA 93308
Ph: 661-391-7518
Fax: 661-391-7404
Email: walshm@kernsheriff.org

Ex. Pg. 2

■ On 12/27/2024 2:50:17 PM, CDCR Public Records wrote:

**Subject:** [Records Center] Data Concierge Service :: ███████████
**Body:**

RE: PUBLIC RECORDS ACT REQUEST December 24, 2024, Reference # ███████████

Dear ███████████

This letter is in response to your Public Records Act request dated December 24, 2024 in which you requested the following records:

**"I am doing fact checking research in regards to former CDCR inmate interviewees. I would like to confirm whether Ethan Rene Wiley former CDCR # BE6607 was ever an inmate at Corcoran State Prison in 2018, 2019. What dates and other CDCR facilities was he held under booking # BE6607, and if its possible to know in what building yards or level for each facility he was held in."**

Your request has been referred to me for response. I have located the record for CDCR number BE6607. Below please find the incarceration and release dates. Unfortunately, we are unable to release the housing information without a valid written authorization from the discharged person.

| | | |
|---|---|---|
| 11/03/2017 | WSP | Admitted Offender with New AOJ |
| 03/14/2018 | SATF | Received from another Facility |
| 11/21/2022 | SATF | Paroled |
| 11/21/2023 | Interstate | Discharged (from Parole) |

If you have any questions or need additional information, you can manage your request through the CDCR PUBLIC RECORDS PORTAL.

Sincerely,

Lanesha Perry



**EX. D**

 **Prisoners Of The United States · Join**
Wood Cut · April 3, 2023 · ⊗

···

Hi everyone, my name is Liam and I work for a TV production company based in the UK called Woodcut Media.

I was hoping to speak with anyone who has previously served time with any of the following prisoners:

- **Jaime Osuna #BD0868**
- **Jason Budrow #V27146**
- **Tyler Bingham #03325-091**
- **Christa Pike #261368**
- **Fotios Geas #05244-748**
- **Edward Mohammed Johnson #174269**
- **James Robertson #322534**

If you have we would like to talk to you about your experience and a new programme we're currently in production for.

My email address is: liam.clark@woodcutmedia.com

(ADMIN PLEASE DELETE IF INAPPROPRIATE)

👍 1

Site source:
https://www.facebook.com/groups/244475937033667/?multi_permalinks=769799671167955